Argued October 8, 1918, reversed and dismissed February 11, 1919.

# SPRINGER *v.* STEINER.

(178 Pac. 592.)

**False Imprisonment—Sufficiency of Evidence.**

1. In action for false imprisonment by one who was confined in insane asylum, evidence *held* insufficient to show that one defendant had anything to do with wrongful incarceration.

**False Imprisonment—Sufficiency of Evidence.**

2. In an action for false imprisonment by one who was confined in insane asylum, evidence *held* insufficient to show that the defendant physician who examined her was cause of confinement.

**Insane Persons—Setting Aside Inquisition.**

3. A judgment declaring one insane could not be set aside on application made two years after its rendition, unless it was absolutely void.

Insane Persons—Confinement in Asylum.

4. Under Laws of 1913, page 680, Section 3, an order, adjudging a person insane and committing her to insane asylum, was not void, although sheriff had no warrant when he took her in custody, and she was taken before the judge only on a verbal order of the latter.

False Imprisonment—Burden of Proof.

5. In action against examining physician for false imprisonment by one adjudged insane and confined in an asylum, burden was upon plaintiff to show, either that physician made no examination as to her condition, or that certificate was maliciously false.

Evidence—Conclusions.

6. In action for false imprisonment by one adjudged insane and confined in asylum, against physician examining her, testimony by plaintiff that defendant asked her no questions in examination which "tended to an examination of her mental condition" was only a conclusion of witness.

False Imprisonment—Confinement in Insane Asylum—Negligence of Examining Physician.

7. A physician is not liable for false imprisonment by reason of negligence in examining one in a proceeding under Laws of 1913, page 680, Section 3, relating to confinement of insane persons, so long as, in issuing certificate of insanity, he acts in good faith and without malice.

[As to when actions for false imprisonment are maintainable, see notes in 54 Am. Dec. 258; 67 Am. St. Rep. 408.]

From Multnomah: HARRY H. BELT, Judge.

Department 2.

This was an action for false imprisonment brought by plaintiff against defendants, arising out of the commitment of the plaintiff to the Oregon State Insane Asylum. As basis of her cause of action plaintiff alleges that the defendants, without any order or warrant for her arrest, caused her to be forcibly taken into custody and conveyed through the public streets to the county jail, imprisoned in a barred cell with common criminals, and thereafter, without cause and without any order or warrant, caused her to be handcuffed and conducted along the public streets; and while so restrained, to be conveyed to the asylum and delivered to the custody of R. E. Lee Steiner, the superintendent thereof; and

did wrongfully and ignorantly claim and assert that plaintiff was an insane person and, by reason of such insanity, unfit to be at large, and caused plaintiff to be confined in such asylum from January 15, 1915, to May 31, 1915, during which time plaintiff claims that various indignities were heaped upon her. That at all of said dates plaintiff was wholly sane, all of which was known to the defendants, or could have been ascertained by the exercise of ordinary care and prudence.

Defendant Howard answered by a general denial. Defendant Holcomb, with practically a general denial, pleaded, as justification, that he was a licensed physician and surgeon; that Thomas J. Cleeton was county judge, and Thomas M. Hurlburt, sheriff of Multnomah County; that on January 8, 1915, plaintiff was detained in the county jail by said sheriff as a person suffering from insanity and mental derangement and unfit to be at large; that on January 8th a hearing upon said charge was had before said county judge, who caused defendant and Dr. Sanford Whiting, a competent physician, to appear at said hearing and examine plaintiff on said charges of insanity and mental derangement; that plaintiff was personally present at said examination; that after a careful examination of plaintiff, defendant Holcomb and Dr. Whiting certified upon oath to said county judge that plaintiff was suffering from insanity and mental derangement; that the said examination was conducted carefully, skillfully and diligently, that the facts stated in said certificate were based upon said examination, and that the diagnosis of the mental condition of the said plaintiff therein was made in good faith and as a result solely of said examination, and

the opinion as to plaintiff's sanity, certified on oath as aforesaid in said certificate, was formed from professional examination of plaintiff as to her health, habits and mental condition, observation of her actions, conduct and conversation at the time of such examination, and information as to such conversation, actions, habits and conduct obtained from others at such examination, which defendant believed to be true; that the said examination of the plaintiff by said defendant, Curtis Holcomb, is the only act or acts done by him individually or with another or others relating in any manner to the plaintiff, and is the transaction out of which the alleged conduct of said defendant as set forth in the complaint arises; that the plaintiff at the time of said examination was insane.

The matter being put at final issue by a reply the case proceeded to trial as to Howard and Holcomb. The defendants Steiner and Griffith were eliminated from the case by judgment on the pleadings before the trial, and the defendant Hull was not served and made no appearance. At the conclusion of the trial defendants Howard and Holcomb separately moved for a judgment of nonsuit, which was denied. Thereafter, each moved for a directed verdict, which was also denied. There was a verdict for plaintiff for $2,500 and from a judgment thereon defendants Howard and Holcomb appeal, assigning among others the following errors:

"The court erred in overruling defendants' motion for a nonsuit.

"The court erred in overruling defendants' motion for an order directing the jury to return a verdict in their favor.

"The court erred in overruling defendants' objections to the testimony of the plaintiff concerning diseases suffered in girlhood, and as to treatments received and in overruling defendants' motion to strike out such testimony.

"The court erred in overruling defendants' motion to strike out all the testimony of the plaintiff as to the treatment received by her while at the Oregon State Hospital for the Insane at Salem.

"The court erred in overruling defendants' objections to direct interrogation 22 in the deposition of Perry J. Green, and permitting the answers thereto to be received in evidence.

"The court erred in overruling defendants' objections to direct interrogation 23 in the deposition of Perry J. Green, and permitting the answer thereto to be received in evidence.

"The court erred in overruling defendants' objections to direct interrogation 24 in the deposition of Perry J. Green and permitting the answer thereto to be received in evidence.

"The court erred in overruling defendants' objections to the letter written by defendant Howard to Perry J. Green concerning plaintiff and permitting the same to be received in evidence.

"The court erred in overruling defendants' objections to the conversation had by defendant Howard with defendant William Hull concerning the arrest of plaintiff, after she had been placed in jail.

"The court erred in overruling the defendants' objections to all that portion of the record of the County Court of Multnomah County, Oregon, had subsequent to the commitment of the plaintiff to the Oregon State Hospital for the Insane at Salem, in the inquisition adjudging her insane, and consisting of the petition of the plaintiff to set the proceedings aside as void, the order of Judge Cleeton setting said petition for hearing, the order of Judge Tazwell setting aside the inquisition as void and directing the county clerk to 'cancel, extirpate and destroy the judgment

and order of commitment,' as set forth in plaintiff's exhibit 'C,' and permitting the same to be received in evidence.''

Error is also predicated upon instructions given, and requested instructions refused by the court.

REVERSED AND DISMISSED.

For appellants there was a brief over the names of *Mr. Thad W. Vreeland, Mr. James K. Weatherford* and *Messrs. Carey & Kerr,* with oral arguments by *Mr. Vreeland, Mr. Weatherford* and *Mr. Chas. H. Carey.*

For respondent there was a brief and an oral argument by *Mr. Wilson T. Hume.*

McBRIDE, C. J.—1. We will first consider the motion for a directed verdict urged on behalf of Dr. Howard. We have carefully examined the evidence and fail to find any testimony indicating that Dr. Howard in any way counseled, assisted or suggested that plaintiff should be proceeded against as an insane person. The complaint was made by Mr. Hull, plaintiff's father, and the arrest and confinement of plaintiff was had possibly at his instigation before the complaint was made and while Dr. Howard was at his home in Linn County. The evidence only goes to the extent of showing that Dr. Howard believed plaintiff insane, and tried to induce her to leave her association with a man who claimed to be a ''New Thought Healer,'' whatever that may be, and who Dr. Howard evidently considered a fraud and quack, and go with Howard and his wife, who was plaintiff's sister, to their home in Linn County. He does not deny that he thought her insane. Indeed, in view of the filthy and profane letters written by her when in the asylum,

and her erratic conduct and conversation in Portland, he would appear to have had some grounds for that opinion. The facts with respect to Dr. Howard's connection with plaintiff's incarceration, when simmered down to concrete propositions, are:

1st. That he earnestly recommended an operation as a means of relief for plaintiff's nervous condition.

2d. That he attempted to persuade her to abandon the treatment with the spiritual healer, whom she designated as her "Christ" and godfather, and according to her statement to him, which is not denied, proposed to make her the one sole woman as his new religious cult.

3d. That he urged her to go home with him and his wife.

4th. That he wrote to Dr. Green, the "Healer" aforesaid, asking him to induce plaintiff to leave Portland and come to Linn County to her relatives, and threatened Green with legal proceedings if he failed to do so.

5th. That he visited and conversed with plaintiff while she was confined in jail prior to being sent to the asylum, and asked her if she was still satisfied that she was "healed."

Plaintiff's father, who made the complaint, denies that Dr. Howard ever suggested she be sent to the asylum. Dr. Howard denies it. He was not present, or in the city, when the proceedings were had in reference to plaintiff's sanity, and there is absolutely no evidence he even suggested or in any way participated in the proceedings. The motion for a directed verdict should have been allowed as to him.

2. We will now consider the case with reference to Dr. Holcomb. It is not claimed that Holcomb was the cause of the confinement of plaintiff in the county jail, or of any treatment she received there. His connection begins lawfully in obedience to a requirement

of the county judge to examine her as to her mental condition. There is no evidence as to what took place at the examination, although the testimony of plaintiff indicates that some examination was had. Plaintiff claims that Dr. Holcomb came to the cell in jail with ''some other fellows'' and talked to her. She says:

''There was no explanation made; they did not introduce themselves; they came in and asked me some questions and I answered their questions until I got indignant, when I thought they asked me questions they had no business to, and then I would not answer any more.''

She thinks they were there probably fifteen minutes. She does not state what questions were asked but was asked the following question by her counsel; ''Did any of the gentlemen in the cell there ask you any question that tended to an examination of your mental condition?'' To which she replied, ''No, sir.'' This was a mere conclusion, or opinion, of the witness as to the significance of the questions asked her, and shed no light upon the matter of the thoroughness of the examination.

Later on, plaintiff, detailing a conversation between herself and Dr. Holcomb in reference to her examination, said:

''I asked him if he remembered some remarks he made, and I refreshed his mind so that he did remember some remarks made during the farce which was called an examination.''

It appears, independent of the certificate of the physician and the record made by the court, that there was an examination made, of which we have no details except that plaintiff was pleased to call it a ''farce.''

3. In addition to this Judge Cleetin, the county judge, testified that he had some recollection of being present at the examination; that he saw plaintiff's husband and talked with the doctors and talked with her and heard some questions propounded to her and her answers. He explains there are several hundred such examinations in the course of the year, and it is difficult to remember any particular case. He states he was personally present part of the time the examination was being held, but sometimes was called away for a short time, but was there enough to see what was going on and get the drift of the examination. Witness was not clear whether the examination was held in his office or the county jail. We further have the record made by the County Court, which recites every jurisdictional fact concerning the examination. It is true that upon the application of plaintiff the court attempted two years after the record was made to set it aside, but unless it was a wholly void record it had no jurisdiction so to do. The principal objection to this record there urged and here relied upon by plaintiff's counsel, is that no warrant of arrest was issued by the court to bring the plaintiff before the court for examination as to her sanity. It is true that there is no record of the issuance of such a warrant, but it is also true that there is no provision of the law requiring a warrant for that purpose.

4. Section 3 of Chapter 342, Laws of 1913, provides that when the county judge is notified in writing that any person by reason of insanity is unsafe to be at large, etc., he "shall cause such person to be brought before him." Such notification in writing had been made by Mr. Hull, plaintiff's father, and plaintiff was at that time in the custody of the sheriff. The judge "caused plaintiff to be brought before him," whether

by a verbal order to the sheriff or by a warrant or written order is not material. She was before him and defendant Holcomb and another physician were appointed to examine her as to her sanity, and upon such examination she was duly adjudged insane. The complaint signed by Mr. Hull was loosely drawn it is true, but it stated enough to set the machinery of the court in motion.

This identical question came up in the case of *Sprigg* v. *Stumps* (C. C.), 8 Fed. 207, in which case the application for the examination was not verified, and no warrant was issued for the arrest of the person alleged to have been insane. There was some sort of an order made directing the sheriff to bring the accused person before the judge, concerning which the court said:

"But admitting, what we think very doubtful, that the order upon which Fulton was arrested and brought before the county judge, although in the form of the statute, was void, as being in conflict with Section 9, *supra,* of the Constitution, concerning the issue of warrants, still the subsequent inquisition by the judge, and the order thereon committing Fulton to the asylum, are founded upon the oath of the physician who examined him and pronounced him insane. If then, the validity of the subsequent appointment of a guardian and the sale by him of the lunatic's property depend upon the legality of the procedure in which Fulton was declared insane, it is certainly sufficient if the inquisition and commitment were legal, even if the original arrest was otherwise."

So here, even if a warrant or other paper directed to the sheriff, had been the proper and regular mode of procedure to authorize the sheriff to bring the plaintiff from one room in the courthouse to another for the purpose of examination, a disregard of this

technical requirement would not oust the court of jurisdiction to inquire into the matter. In the case above cited, many of the objections to the record are practically identical with those raised by counsel in this case on plaintiff's application to set aside the order adjudging her insane, and none of these objections were held valid. Where the record is void upon its face the court may at any time expunge it: *Ladd* v. *Mason,* 10 Or. 308; *Jones* v. *Jones,* 59 Or. 308 (117 Pac. 414). But if the judgment is merely irregular the remedy is by appeal or review. We conclude, in the present instance, that the order committing plaintiff was valid, and the County Court had no jurisdiction to order it canceled or set aside two years after it was made.

5, 6. The burden of proof is upon the plaintiff to show either that the physicians made no examination as to the condition, or that the certificate was maliciously false. Her opinion that it was a "farce" states no probative fact. Her statement that no question was asked her in a fifteen minute examination, which she admits was made, which "tended to an examination of her mental condition" is another conclusion stating no fact upon which a verdict could be founded. Plaintiff testified that after her release from the asylum she had a conversation with Dr. Holcomb, in which he impliedly admitted that his certificate was based on information derived from the relatives. If such was the fact the jury would have a right to consider it in determining whether the certificate was negligently given, but not that it was given maliciously or in bad faith. It is not the intention of the writer to intimate that the examination was not carefully conducted in this case. His personal opinion is exactly to the contrary, but there are at least

some shreds of evidence from which the jury might form such an opinion.

7. Without discussing further the errors alleged by defendants, we will now call attention to certain conditions which render it impossible for plaintiff to recover under the testimony here adduced. It will be remembered that this is not an action against Dr. Holcomb for malpractice in not using reasonable skill and diligence in examining into and diagnosing plaintiff's condition. It is an action for negligently causing plaintiff to be falsely arrested and imprisoned in the asylum. Whatever may have been the character of the examination (and the record made by the county judge, who had general supervision over it, says that it was "careful"), the defendant Holcomb did not and could not arrest or cause the plaintiff to be confined in the asylum. The defendant's examination and certificate would be utterly worthless in themselves to cause the confinement of plaintiff. They are merely evidence (of a high order it is true) which the county judge may accept or reject.

Under the old statutes in England the certificate of the examining physician was the basis for the arrest and confinement of an alleged insane person. There was no written complaint required and no examination before any court or judicial officer. The person alleging insanity of another could apply to two physicians to examine the alleged lunatic, and if these physicians certified to his insanity the complaining party could, by a request in writing to the keeper of any licensed asylum, have the subject summarily seized and locked up without further ceremony. Under this statute it was held that an action would lie against a physician for a careless and negligent examination, whereby a sane man was incarcerated, the leading

case on this subject being *Hall* v. *Semple*, 3 Foster
& Finlayson's Rep. 337. But in most of the states in
the Union a judicial examination is required, and the
alleged lunatic must be formally adjudged insane by
some judicial officer upon the evidence before him,
which includes the sworn certificate of the physicians,
before he can be deprived of his liberty. The physi-
cian therefore becomes practically an expert witness,
whose testimony the court may accept or reject as its
own views may suggest. Such being the case, the
physician would seem to be entitled to the same privi-
leges and immunities as other witnesses, among which
has always been included an exemption from a civil
action for any testimony given in the course of judi-
cial proceedings.

Such is the view taken by the Supreme Court of
Massachusetts under a statute almost identical with
our own, in which it is said:

"But it is manifest from the provisions to which we
have referred that, although the certificate of the ex-
amining physicians is intended to have great weight,
and no doubt does in practice, a commitment cannot
take place without an order from the judge and a find-
ing by him that the person committed is insane, and
without the judge seeing and examining the person
alleged to be insane, or stating the reason for not
doing so. In this case there is no averment in the
declaration that there was no oral testimony, or that,
if there was, the judge did not base his finding upon
it, but upon the certificate furnished by the defend-
ants. It is difficult to see, therefore, how, assuming
that there was negligence in the examination, and
that the certificate was false, it can be said that that
was the proximate cause of the commitment: See
*Force* v. *Probasco*, 43 N. J. Law, 539. But, further,
the examining physicians are called upon to perform
an important duty. In discharging it they are not en-

gaged in the ordinary practice of their profession. If
they do not occupy a *quasi* official or judicial position,
they at least occupy the position of persons whose tes-
timony is expressly required by statute in aid of judi-
cial proceedings having for their object to ascertain
whether the condition in regard to dipsomania or in-
ebriety of the person to whom they relate is such that
he should be restrained. It is important that the
judges who are charged with the duty of investigating
cases of dipsomania or inebriety and insanity should
have the assistance, in forming their conclusions, of
persons whose profession is such as to give their opin-
ions peculiar value in such matters. The statute
recognizes this by requiring the certificate. And we
think that the privilege which attaches to parties and
witnesses in other judicial proceedings, to parties in-
stituting criminal proceedings, and to cases of privi-
leged communications should attach to examining phy-
sicians in cases like the present, and that, so long as
they act in good faith and without malice, they should
be exempt from liability: See *Hoar* v. *Wood,* 3 Met.
(Mass.) 193; *Barker* v. *Stetson,* 7 Gray (Mass.), 53 (66
Am. Dec. 457); *Rice* v. *Coolidge,* 121 Mass. 393 (23
Am. Rep. 279); *Tasker* v. *Stanly,* 153 Mass. 148 (26
N. E. 417, 10 L. R. A. 468); *Gifford* v. *Wiggins,* 50
Minn. 401 (52 N. W. 904, 18 L. R. A. 356). It is more
important that the administration of the laws in the
manner provided should not be obstructed by the fears
of physicians that they may render themselves liable
to suit than it is that the person certified by them to
be insane, or a dipsomaniac, or inebriate should have
a right of action in case it turns out that the certifi-
cate ought not to have been given'': *Niven* v. *Boland,*
177 Mass. 11 (58 N. E. 282, 52 L. R. A. 786).

There is not the slightest evidence of malice or con-
spiracy between Dr. Holcomb and any other person to
cause plaintiff to be confined in the asylum. There is
only a shred of testimony and that of doubtful value,

91 Or.—8

that his examination was not so thorough as it might have been—nothing to impeach his entire good faith in making the certificate. We believe the decision above quoted is in accord with sound public policy and correctly states the law and adopt it as applicable to the case at bar. The court should have directed a verdict as to the defendant Holcomb.

The judgment will be reversed and the cause dismissed.          REVERSED AND DISMISSED.

BEAN and JOHNS, JJ., concur.